# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

CIVIL ACTION NO. 4:09-CV-00029-JHM

MICHAEL GERHARDT and
MICHAEL GERHARDT, Administrator of the
Estate of DEBRA GERHARDT                                                    PLAINTIFFS

And

ALCAN PRIMARY PRODUCTS CORPORATION/
LIBERTY MUTUAL INSURANCE COMPANY                    INTERVENING PLAINTIFF

V.

CATTRON-THEIMEG, INC.                                                        DEFENDANT

V.

ALCAN PRIMARY PRODUCTS CORPORATION           THIRD-PARTY DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Summary Judgment Motion of Defendant, Cattron-Theimeg, Inc. ("Cattron") [DN 53]. Also before the Court is the Summary Judgment Motion of Third-Party Defendant, Alcan Primary Products Corporation ("Alcan") [DN 55]. Fully briefed, this matter is ripe for decision. For the following reasons, Cattron's summary judgment motion is **GRANTED** in part and **DENIED** in part. Alcan's summary judgment motion is **GRANTED**.

## I. BACKGROUND

On April 6, 2008, Plaintiff Michael Gerhardt was employed by Alcan. He worked as a caster-furnace man and overhead crane operator at Alcan's aluminum smelting plant in Robards, Kentucky. (Compl. [DN 1-2] ¶ 3.) On this date, Mr. Gerhardt was operating an overhead crane, the movement of which was controlled by a radio remote control device he wore by a harness around his neck. The device was manufactured by Cattron. (Id. ¶ 4; Michael Gerhardt Dep. [DN

63-2] 60-61.) Mr. Gerhardt was operating the crane to retrieve a 10-inch bottom block assembly, which weighed approximately10,000 pounds. (See id. ¶ 4; CSHO Report [DN 64-9] 8.)

While attempting to attach a lifting device to the bottom block assembly, a motion lever on the radio remote control device was inadvertently engaged. This caused the crane to move the bottom block assembly toward Mr. Gerhardt, pinning him against a furnace. He was seriously injured. (Id. ¶¶ 4-5.) It is undisputed that since the accident, Alcan and its workers' compensation insurer, Liberty Mutual Insurance Company, have paid Mr. Gerhardt's medical expenses, as well as Kentucky workers' compensation benefits. (See Gerhardt Dep. [DN 55-6] 7.)

Mr. Gerhardt and his wife, Debra Gerhardt, filed this products liability action against Cattron in the Henderson Circuit Court, alleging that Mr. Gerhardt's injuries were caused by the radio remote control device's defective design. (Compl. [DN 1-2] ¶ 5.) Specifically, the Plaintiffs allege six causes of action: (1) strict liability for selling an unreasonably dangerous device; (2) negligence in selling an unreasonably dangerous device; (3) failure to give sufficient warnings as to the device's dangerous condition; (4) breach of the implied warranties of merchantability and fitness; (5) gross negligence; and (6) loss of consortium. (See generally id.) As to their defective design claims, the Plaintiffs argue that the radio remote control device was defective because it did not include an engaged, functioning push-to-operate ("PTO") bar switch and because its "lever bar guard" offered inadequate protection from inadvertent contact with the motion levers.

Cattron removed the Plaintiffs' action to this Court based on diversity jurisdiction. (Not. of Removal [DN 1].) Thereafter, Cattron filed a third-party complaint against Alcan and Alcan filed an intervening complaint against Cattron. (See Third-Party Compl. [DN 16]; Inter. Compl. [DN 36].) In its third-party complaint against Alcan, Cattron asserts indemnification and contribution claims. Alternatively, Cattron asserts that it is entitled to an allocation of fault or apportionment. (Third-Party Compl. [DN 16].) In its intervening complaint against Cattron, Alcan seeks recovery

of "all compensation, medical, income, rehabilitation and other benefits paid or payable to or on behalf of the Plaintiff, Michael Gerhardt, from the defendant." (Inter. Compl. [DN 36] 2.)

On February 11, 2013, both Cattron and Alcan filed summary judgment motions. Cattron argues that under Kentucky law, it is not liable to the Plaintiffs because: (1) it manufactured the radio remote control device according to the design specifications required by Alcan; and (2) the lever bar guard was state-of-the-art when sold and there is no evidence of a feasible alternative design. (See Mem. in Supp. of Mot. for Summ. J. [DN 53-1] 2.) Alcan argues that it is entitled to summary judgment on Cattron's third-party complaint because: (1) the protections afforded by Kentucky workers' compensation statutes preclude Cattron from seeking indemnification; and (2) under the facts of this case, Cattron is not entitled to contractual indemnification. (See Mem. of Law in Supp. of Mot. [DN 55-1] 8-9.) The Court will consider the parties' motions below.

## II. STANDARD OF REVIEW

Before the Court may grant a summary judgment motion, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

### III. CATTRON'S MOTION FOR SUMMARY JUDGMENT [DN 53]

The Court will first consider the parties' arguments related to the Plaintiffs' claims of strict liability for selling an unreasonably dangerous device, negligence in selling such a device, and failure to give sufficient warnings as to the device's dangerous condition. The Court will then consider the parties' arguments related to the Plaintiffs' claims of breach of the warranties of merchantability and fitness, gross negligence, and loss of consortium.

#### A. COUNTS I, II, AND III: STRICT LIABILITY, NEGLIGENCE, AND FAILURE TO WARN

In Counts I, II, and III of their Complaint, Plaintiffs allege that Cattron sold a defectively designed, unreasonably dangerous device with insufficient warnings. (Compl. [DN 1-2] ¶¶ 5-21.) Specifically, Plaintiffs allege that the remote control device was defectively designed because it did not include an engaged PTO bar switch and because the lever bar guard offered inadequate protection from inadvertent contact with the motion levers. In its summary judgment motion, Cattron contends that Plaintiffs' claims must be dismissed since: (1) it manufactured the device in accord with the design specifications required by Alcan; and (2) the lever bar guard was state-of-the-art when sold and there is no evidence of a feasible alternative design. For the following reasons, Cattron's summary judgment motion is **DENIED** in part as to Plaintiffs' strict liability and negligence claims. It is **GRANTED** in part as to Plaintiffs' failure-to-warn claim.

**PTO Bar Switch.** In his position as an overhead crane operator for Alcan, Mr. Gerhardt used radio remote control devices to operate overhead cranes. In his deposition, he stated that he had done so daily on the job since 1979. (See Gerhardt Dep. [DN 54-1] 50-53.) At one point in time, Alcan's employees used devices that were manufactured by Telemotive. However, Alcan subsequently purchased Cattron devices. (See Mike Deal Dep. [DN 54-8] 12, 31.) In 2003, initial Cattron devices were shipped to Alcan, equipped with engaged PTO bar switches. (Id. at 30-31.)

A PTO bar switch essentially requires a crane operator to maintain contact on the switch at all times for the various motion lever switches to transmit movement signals to the overhead crane. (Robert Aiken Dep. [DN 54-4] 25-27.) In other words, a PTO bar switch forces a crane operator to take two actions before an overhead crane will move: first, the operator must activate the PTO bar switch by ensuring that it is in the "on" position; and second, the operator must manipulate the motion levers. A PTO bar switch electronically disconnects all motions when it is released, thus stopping the motion levers from transmitting any movement signals. (Id.)

Several of the overhead crane operators at Alcan did not like the PTO bar switch feature that was incorporated into the initial Cattron devices. They thought they "lost communication" with the crane on releasing the PTO bar switch. The operators believed that lost communication was dangerous since it could cause molten metal carried by the crane to slosh around. (See Deal Dep. [DN 54-8] 33-37, 41-42; Richard Cocco Dep. [DN 54-2] 44, 54-55; Marvin Eyre Dep. [DN 54-9] 13-18; John Golden Dep. [DN 54-10] 34-38; Allan Salsbury Dep. [DN 54-3] 13-14.) Many of the operators began using O-rings or rubber bands to hold the PTO bar switches in the "on," activated position. (See Salsbury Dep. [DN 54-3] 14; Golden Dep. [DN 54-10] 34.)

When Alcan's safety personnel noticed this practice, a series of meetings convened to determine whether the PTO bar switch was a feature that Alcan wanted its radio remote control

devices to have. As a result of these meetings, Alcan concluded that having an engaged PTO bar switch created a greater hazard than not having it. Alcan decided to ask Cattron to retrofit the devices by disengaging the PTO bar switches. (See Cocco Dep. [DN 54-2] 20, 43-44; Golden Dep. [DN 54-10] 48-59.) Alcan submitted a final purchase order containing this request. (See Purchase Order [DN 53-4].) Cattron complied with this order.

Cattron now argues that under Kentucky law, it is not liable for Mr. Gerhardt's injuries since it manufactured the radio remote control device according to Alcan's design specifications. In support, Cattron relies on McCabe Powers Body Co. v. Sharp, 594 S.W.2d 592 (Ky. 1980). In that case, a manufacturer constructed an aerial boom in accord with its buyer's specifications, designing the bucket on the boom to have one open side. The buyer's employee later fell through that side, falling 15 to 17 feet to the ground and receiving serious injuries. The employee sued the manufacturer, asserting strict liability and negligence for the bucket's deficient design. Id. at 593.

The Kentucky Supreme Court began by noting that "when the claim asserted is against a manufacturer for deficient design of its product the distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care." Id. at 594. It then addressed the issue of the manufacturer's liability for designing the product in line with the buyer's specifications. The Court concluded as follows:

> [O]rdinarily where a product is manufactured according to plans and specifications furnished by the buyer and the alleged defect is open and obvious, the manufacturer is protected from liability for injuries occasioned by use of the product.
>
> In arriving at this conclusion we recognize that plans and specifications furnished by a buyer could contain design defects so extraordinarily dangerous that a product manufacturer should decline to produce or, if appropriate, issue warnings as to the use of the product. We do not see this circumstance in the bucket manufactured by McCabe.

Id. at 595. In support of its decision, the Court relied on the Sixth Circuit's opinion in Garrison v. Rohm & Haas Co., 492 F.2d 346, 351 (6th Cir. 1974). In that case, the Sixth Circuit refused to hold a manufacturer liable for defective design when it designed a product according to a buyer's specifications. The Sixth Circuit noted that imposing liability in such cases "would amount to holding a non-designer liable for design defect. Logic forbids any such result." 492 F.2d at 351.

Cattron argues that since the uncontroverted evidence shows that Alcan wanted the PTO bar switches disabled, and since Alcan instructed Cattron to that effect in its purchase order, it cannot be liable to Mr. Gerhardt for his injuries. Cattron contends that the disengaged PTO bar switches were "open and obvious" to any competent overhead crane operator—especially to such operators at Alcan, in light of Alcan's internal debate regarding whether the switches should remain engaged. Cattron also contends that the alleged design defect in the present case was not "so extraordinarily dangerous" that Cattron should have declined to produce the remote control devices without engaged PTO bar switches. The Plaintiffs make several counter-arguments.

The Plaintiffs first argue that McCabe has little or no precedential value under the current state of Kentucky law. In support of this argument, the Plaintiffs highlight that McCabe was decided when contributory negligence was the law in Kentucky, before Kentucky courts adopted pure comparative fault in Hilen v. Hays, 673 S.W.2d 713, 720 (Ky. 1984). According to the Plaintiffs, the Court's ruling in McCabe was consistent with contributory negligence, resulting in a total defense for the manufacturer. The Plaintiffs argue that McCabe is, in effect, an application of the contributory negligence bar. The Plaintiffs suggest that because contributory negligence is no longer the law in Kentucky, McCabe has no continued viability. (See Pls.' Resp. [DN 62] 30.)

However, the Court finds this argument to be without merit. As Cattron accurately states, McCabe is not an application of the contributory negligence bar. Instead, its holding only applies

in narrow instances when an alleged product defect has been manufactured at the specific request of the product's buyer. It does not result in a "total defense" for a manufacturer, as it does not necessarily defeat all claims brought against manufacturers for defects. Instead, several defects may still result in the imposition of liability on the manufacturer—including those that were not requested by a buyer, those that are concealed, and those that are so extraordinarily dangerous that the manufacturer should have declined to produce the product in accord with a buyer's plans. Indeed, the Court thus finds that <u>McCabe</u> has continued viability under Kentucky law.

It is noteworthy that <u>McCabe</u> has never been overruled by the Kentucky Supreme Court. In fact, other courts have recently acknowledged that <u>McCabe</u> remains the controlling authority under Kentucky law. <u>See, e.g.</u>, <u>Crawford v. Line Power Mfg. Corp.</u>, 165 F.3d 26, at *8-10 (6th Cir. Sept. 15, 1998); <u>Vaughn v. Alt. Design Mfg. & Supply, Inc.</u>, 2008 WL 4602960, at *7 (E.D. Ky. Oct. 16, 2008). While Plaintiffs claim that <u>Smith v. Louis Berkman Co.</u>, 894 F. Supp. 1084 (W.D. Ky. 1995), defines the current law on design defects, the Court finds that it is inapposite.

In <u>Smith</u>, the manufacturer raised the "government contractor defense" to argue that it was not liable for any defects in a salt spreader. The government contractor defense is generally raised in cases where a supplier manufactures a product in accord with the **federal** government's precise specifications. In these situations, it has been held that the defense preempts state law liability for design defects on the ground that "state law acts to frustrate specific objectives of federal legislation." <u>Id.</u> at 1094 (citing <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500, 507 (1988)). The manufacturer in <u>Smith</u> argued that the government contractor defense was applicable since the salt spreader met the **state** government's specifications. But the Court rejected this argument, holding that "the theoretical support for the defense lies in a conflicting relationship between federal and state law, which did not exist in this case." <u>Id.</u> The Court finds <u>Smith</u> has no impact

here. In <u>Smith</u>, customer-design issues were only briefly discussed in the specific context of the government contractor defense. Because the parties did not analyze <u>McCabe</u>, its impact was not considered. This Court is not convinced that <u>Smith</u> overrules <u>McCabe</u>.[1]

The Plaintiffs next argue that even if <u>McCabe</u> applies, summary judgment is inappropriate. According to them, there are genuine issues of material fact which preclude summary judgment.

*Open and Obvious.* As noted above, <u>McCabe</u>'s holding that a manufacturer is not liable for manufacturing a product according to a buyer's plans **only** applies when the alleged defect is "open and obvious." The Kentucky Supreme Court held that it did "not express an opinion as to a concealed defect in design produced according to plans and specifications furnished by a buyer." 594 S.W.2d at 595. In other words, while the Court did not intend its holding to apply to alleged defects that were somehow hidden from a buyer's employees, it did intend its holding to apply to alleged defects that were noticeable or apparent to a buyer's employees.

Here, the Plaintiffs argue that there is a genuine issue of material fact on whether the defect was "open and obvious." In support of this argument, the Plaintiffs cite Mr. Gerhardt's deposition testimony where he states that at the time of his accident, he did not know that the PTO bar switch was not activated and did not even know what the PTO bar switch was. (See Gerhardt Dep. [DN 63-2] 109-110.) The Plaintiffs contend that this testimony shows that Mr. Gerhardt never dwelt upon the PTO bar switch among the other controls. (<u>Id.</u> at 112.) They also contend that while he may have assumed that it was a kind of safety device, (<u>id.</u> at 111), the jury should be asked to determine whether it was "open and obvious."

Cattron counters that there is no genuine issue of material fact concerning the openness or obviousness of the disengaged PTO bar switch. According to Cattron, the evidence clearly shows

---

[1]The Court's conclusion finds support from the Sixth Circuit's decision in <u>Crawford v. Line Power Manufacturing Corp.</u>, 165 F.3d 26, 1998 WL 681220 (6th Cir. Sept. 15, 1998), which is discussed below. <u>Crawford</u> was rendered **after** <u>Smith</u>. In that decision, the Court acknowledged that <u>McCabe</u> is the controlling authority.

that the disengaged PTO bar switches were "open and obvious" since the switches remained on the radio remote control devices as a "black strip." (See Gerhardt Dep. [DN 63-2] 109.) Cattron contends that it is disingenuous for the Plaintiffs to argue that Mr. Gerhardt did not know that the radio remote control devices did not have activated PTO bar switches—especially in light of his statement that he never thought he had to have his hand on the black strip to operate the device. (Gerhardt Dep. [DN 54-1] 110-111.) Cattron also contends that the "open and obvious" nature of the PTO bar switches is evident from Alcan's internal debate regarding such switches.

Based on the evidence of record, the Court finds Cattron's argument more persuasive. The alleged design defect is that the crane could move if the motion levers were inadvertently engaged. Plaintiffs have attempted to create a genuine issue of material fact by citing portions of Mr. Gerhardt's deposition testimony where he indicates he was unaware of the PTO bar switch's nature or purpose. The Court finds, however, that this cited testimony does not show that the alleged defect was concealed. There is no genuine issue of material fact as to whether it was "open and obvious" to the operator that the crane would move if the motion levers were engaged. In other words, the operator knew that he did not have to engage another switch in order to get the crane to move. The Court finds that the absence of the safety switch was "open and obvious."

Mr. Gerhardt's deposition testimony, when read in full, supports this holding. It shows that Mr. Gerhardt was aware that the radio remote control device he was using did not have an enabled PTO bar switch. For example, when asked whether he ever thought that he had to have the palm of his hand on the PTO bar switch when he operated the remote control device, he unequivocally stated "No." (Gerhardt Dep. [DN 54-1] 110-111.) Also, the internal history at Alcan supports the Court's holding. As noted above, Alcan's crane operators had used devices that were equipped with functioning, engaged PTO bar switches. This had caused many of the

operators to use O-rings or rubber bands to disengage the switches. In turn, an internal debate ensued which resulted in the switches being disengaged. The Court finds that there is no genuine issue of material fact as to whether the alleged defect was "open and obvious."

*Extraordinarily Dangerous.* Whether the alleged defect is "open and obvious" does not end the inquiry. In <u>McCabe</u>, the Court recognized that some plans furnished by a buyer could contain design defects "so extraordinarily dangerous" that a product manufacturer should decline to produce the product pursuant to those plans. The Plaintiffs thus argue that there is a genuine issue of material fact regarding whether the alleged design defect was "so extraordinarily dangerous" that Cattron should have declined to produce the devices without engaged PTO bar switches. According to Plaintiffs, the extraordinarily dangerous nature of the devices is shown by Cattron's Operating Manual, which states that using a device without an engaged PTO bar switch "may result in damage to equipment, serious injury, or death." (T834ACT & T836ACT Controllers, Safety Summ. [DN 63-5] iii.) The Plaintiffs propose that a reasonable juror could conclude from this warning that Cattron should not have sold the devices in accord with Alcan's request because Cattron knew that by doing so, it was creating a risk of serious injury or death to Alcan's crane operators. Plaintiffs highlight that their experts opine that Cattron should not have sold the subject devices with disengaged PTO bar switches. (<u>See</u> Pls.' Resp. to Mot. for Summ. J. [DN 62] 21.)

Cattron counters that no reasonable juror could conclude from the evidence that the alleged design defect was so extraordinarily dangerous that it should have declined to produce the devices without engaged PTO bar switches. In support of this argument, Cattron highlights that there is no government regulation or engineering standard requiring the incorporation of an engaged PTO bar switch into a radio remote control device. Cattron also highlights that many

controllers on the market do not incorporate an engaged PTO bar switch. (See CSHO Report [DN 71-1] 9; Ralph Barnett Report [DN 70-2] 7.) Finally, Cattron notes that the uncontroverted evidence shows that its radio remote control device had other built-in safety features, rendering their decision to deactivate the PTO bar switches reasonable. These features include: (1) a power "on-off" switch that places the crane in a fully "stopped" mode; (2) a low battery detection circuit to ensure that the system's electronics would not operate when battery voltage was insufficient; (3) spring-loaded "return to center" motion control levers so that the crane's motion would be commanded to cease by simply releasing the lever; (4) a "reset circuit" which requires the operator to press and hold an alarm to reset the crane's main power; and (5) a lever bar guard. (See Aiken Report [DN 70-1] 2; Barnett Report [DN 70-3] 7.)

Based on the evidence of record, the Court agrees with the Plaintiffs and holds that there is a genuine issue of material fact regarding whether the alleged defect was so extraordinarily dangerous that Cattron should have declined to produce the devices without engaged PTO bar switches. As Cattron notes, reasonable jurors could conclude from the evidence that Cattron's design **was not** so extraordinarily dangerous that Cattron should have declined to produce the device as it did—especially in light of the extensive internal debate at Alcan, the devices' other safety features, and the absence of a regulation mandating the inclusion of an engaged PTO bar switch. But reasonable jurors could also conclude that Cattron's design **was** so extraordinarily dangerous that Cattron should not have manufactured the devices as it did—especially because Cattron initially provided Alcan with devices containing engaged PTO bar switches and Cattron warned that such switches were necessary to prevent risk of serious injury or death. Reasonable minds could differ as to whether it was acceptable for Cattron to defer to Alcan's plans. Thus, a jury should be permitted to consider the evidence and make its own determination.

The Court's conclusion is supported by <u>Lane v. Deere & Co.</u>, 2003 WL 1923518 (Ky. App. Mar. 21, 2003). In <u>Lane</u>, the Kentucky Court of Appeals considered whether a bull dozer was defectively designed because side screens were offered as optional, rather than standard, equipment. The Court held that the issue of offering screens "was but one consideration in the jury's determination of whether the dozer was in a defective condition unreasonably dangerous." <u>Id.</u> at *14. In this case, a similar conclusion is warranted. By deferring to its purchaser's requests, Cattron basically created a situation where it offered engaged PTO bar switches as an option. As such, there is a jury question surrounding Cattron's liability.

Likewise, the Court's conclusion is supported by <u>Pike v. Benchmaster Manufacturing Co.</u>, 696 F.2d 38 (6th Cir. 1982). In that case, the plaintiff brought a products liability action against the manufacturer of a punch press after he lost portions of four fingers by moving one of his hands under the press. <u>Id.</u> at 39. The manufacturer had sold the press without a device that would have required its operator to use both hands to activate the press—a safety feature that would have kept the plaintiff's hands clear of the press as he operated it. The manufacturer had offered such a device as an option, but the employer had declined to purchase it. <u>Id.</u> The Sixth Circuit held that the manufacturer could be liable, noting:

> Benchmaster had to "contemplate" that a user would operate it without a two-handed switch. Benchmaster also furnished the press to the purchaser without any safety feature which would prevent, or even tend to prevent, the operator's hands being under the ram at the instant of its 10,000 pound stroke.

<u>Id.</u> at 42. Again, the Court finds that a similar conclusion is warranted in this case. By deferring to its purchaser's requests, Cattron created a situation where it offered engaged PTO bar switches as an option. As such, it had to contemplate that buyers would opt to disengage the switches. There is a jury question surrounding Cattron's liability.

The Court notes that in <u>Lane</u> and <u>Pike</u>, the courts did not consider <u>McCabe</u>. However, if <u>McCabe</u> had been considered, they might have concluded that there was a jury question as to whether the bull dozer or the punch press was so extraordinarily dangerous that the manufacturer should have declined to produce them. As in this case, there was evidence in <u>Lane</u> and <u>Pike</u> supporting that conclusion. In this respect, the Court turns to <u>Crawford v. Line Power Mfg. Corp.</u>, 165 F.3d 26, 1998 WL 681220 (6th Cir. Sept. 15, 1998).

Cattron relies on <u>Crawford</u> to distinguish this case from <u>Pike</u>. In <u>Crawford</u>, the Sixth Circuit held there was no jury question concerning whether there was a design defect in an electrical device after a coal mine electrician suffered a severe electric shock while working on that device. <u>Id.</u> at *1. The Court stated:

> If <u>McCabe</u> had been considered, the <u>Pike</u> panel might still have concluded that there was a jury question as to whether the press was "so extraordinarily dangerous that a product manufacturer should decline to produce" it. Not only were there no safety features provided, in <u>Pike</u>, but the operator was required by the design to stand immediately in front of the activated press in order to operate it. In the case at bar, by contrast, Line Power had provided safety features that were subsequently removed—and, as Mr. Crawford acknowledged, the design of the power center did not make it necessary for him to remove the lid to the high voltage bay while it was still energized.

<u>Id.</u> at *9. Here, Cattron argues that the case is more similar to <u>McCabe</u> than <u>Pike</u> because Cattron provided additional safety features on the remote control devices. The Court finds, however, that the adequacy of the additional safety features is questionable here because Cattron first included engaged PTO bar switches in its design **with** the other safety features—and then later produced the devices without such engaged switches. There has been no evidence that the safety features were changed or added to offset the lack of an engaged PTO bar switch. There is a genuine issue of material fact as to the devices' extraordinarily dangerous nature. Cattron's summary judgment motion is **DENIED** in part with respect to the Plaintiffs' strict liability and negligence claims.

*Insufficient Warnings.* The Plaintiffs next argue there is a genuine issue of material fact regarding whether Cattron's warnings were sufficient under the circumstances. It is undisputed that the following warning was contained in Cattron's Operating Manual:

> **WARNING:**
> **NEVER DISABLE THE PUSH TO OPERATE (PTO) BAR SWITCH ON YOUR REMOTE CONTROLLER. FAILURE TO COMPLY WITH THIS WARNING MAY RESULT IN DAMAGE TO EQUIPMENT, SERIOUS INJURY, OR DEATH.**

(T834ACT & T836ACT Controllers, Safety Summ. [DN 63-5] iii (emphasis in original).)

According to the Plaintiffs, Cattron had a duty to provide more extensive warnings in this case since the above warning was rendered a nullity. The Plaintiffs note that the warning only states that users should not disable the PTO bar switch, and because Cattron sold the devices with disengaged PTO bar switches, the warning "was merely empty words." (See Pls.' Resp. to Mot. for Summ. J. [DN 62] 21.) Cattron maintains that the danger to Mr. Gerhardt was open and obvious, absolving it of any duty to provide more extensive warnings. The Court agrees with Cattron.

Under Kentucky law, "the manufacturer has a duty to warn the ultimate user of any dangers in its product (other than those that are open or obvious)." Crawford, 165 F.3d at *10 (citing Montgomery Elevator Co. v. McCullough, 676 S.W.2d 776, 782 (Ky. 1984)). Indeed, "there is no duty to warn the user of a product when the user is aware of the product's danger." Hutt v. Gibson Fiber Glass Prods., Inc., 914 F.2d 790, 793 (6th Cir. 1990) (applying Kentucky law). In this case, as discussed above, the undisputed facts show that it was "open and obvious" to Alcan personnel, including Mr. Gerhardt, that the subject radio remote control device did not have an activated PTO bar switch. Indeed, Mr. Gerhardt knew that when the motion levers were moved, either intentionally or inadvertently, signals would transmit to the overhead crane and cause it to move. (See Gerhardt Dep. [DN 54-1] 110 (relaying his understanding that when one takes his hands off the motion levers, the crane stops moving).) This knowledge constituted its

own warning. There is no genuine issue of material fact concerning the Plaintiffs' failure-to-warn claim. Cattron's summary judgment is thus **GRANTED** in part with respect to that claim.

**Lever Bar Guard.** The "lever bar guard" provides some protection from controller lever movement. It attempts to protect crane operators from inadvertently transmitting movement signals to the crane through accidental bumps. (See Aiken Dep. [DN 54-4] 66-67.) Lever bar guards are standard in the industry. Cattron has offered them for more than 20 years on control devices. (Id. at 17, 71.) In this case, Cattron conducted no independent safety analysis at the time the subject devices were manufactured regarding whether the lever bar guard needed to be re-designed or whether the guard carried forward from prior units was safe and adequate. (Id. at 75.) Cattron was simply satisfied that the design was both adequate and safe. (Id. at 65.)

The Plaintiffs argue that the lever bar guard was defectively designed because it allowed accidental contact with the motion levers. Cattron counters that: (1) the lever bar guard was state-of-the-art when sold; and (2) there is no evidence of a feasible alternative design.

*State-of-the-Art.* In the introductory section of its summary judgment motion, Cattron states that the lever bar guard "was state of the art at the time of its sale to Alcan . . . ." (Mem. in Supp. of Mot. for Summ. J. [DN 53-1] 2.) However, Cattron fails to elaborate on this argument. It seems to the Court that Cattron's argument might be based on the expert report of Robert Aiken, who is Cattron's Vice President of Engineering. In Mr. Aiken's report, he opines that the lever bar guard, when used in conjunction with an engaged PTO bar switch, provides "state of the art" safety. (Aiken Report [DN 70-1] 4.) But as Plaintiffs note, because the controller sold by Cattron did not have an engaged PTO bar switch, Cattron's argument regarding state-of-the-art safety is missing one of its premises. As such, the Plaintiffs' design defect allegation regarding the lever bar guard cannot be dismissed on this ground.

*Feasible Alternative Design.* Cattron next argues that the Plaintiffs have not introduced evidence of a feasible alternative design. According to Cattron, while the Plaintiffs argue that the lever bar guard was defectively designed because it allowed accidental contact with the motion levers, they fail to realize that it is not feasible to eliminate all possible accidental contact and still have a functional remote control device. (See Mem. in Supp. of Mot. for Summ. J. [DN 53-1] 24.) Cattron contends that an analogous situation would be a piano keyboard: "if a player closes the cover, he can't play the keys." If the level bar guard on a radio remote control device is completely closed, "inadvertent activation is minimized but the operator is then prevented from accessing any of the safety controls." (Id.) The Plaintiffs counter that they have produced sufficient evidence of a feasible alternative design. The Court agrees with the Plaintiffs.

Kentucky law provides that in all products liability actions, the plaintiff must establish that the product at issue is defective. See Leslie v. Cincinnati Sub-Zero Prods., Inc., 961 S.W.2d 799, 803-04 (Ky. App. 1998); Montgomery Elevator Co., 676 S.W.2d 776, 782 (Ky. 1984). Proof of nothing more than that an injury would not have occurred if the product was designed differently is not sufficient to establish a breach of the manufacturer's duty as to the design of its product. Jones v. Hutchinson Mfg., Inc., 502 S.W.2d 66, 70-71 (Ky. 1973). Under Kentucky law, in cases such as this, a plaintiff is required to produce competent evidence of a feasible design alternative that would have prevented the injury. See Cummins v. BIC USA, Inc., 835 F. Supp. 2d 322, 326 (W.D. Ky. 2011); see also Toyota Motor Corp. v. Gregory, 136 S.W.3d 35, 41-42 (Ky. 2004) (noting that the plaintiff's counsel acknowledged on the record that her client had the burden of proving an alternative design); McCoy v. Gen. Motors Corp., 47 F. Supp. 2d 838, 840 (E.D. Ky. 1998) (granting the defendant's summary judgment motion since the plaintiff failed to "offer proof of an alternative safer design, practicable under the circumstances"); Hopkins v.

Ford Motor Co., 2011 WL 5525454, at *3 (W.D. Ky. Nov. 14, 2011) (noting that district courts in Kentucky have extended the reasonable alternative requirement to all design defect claims).

In this case, the Plaintiffs argue that the "immediately apparent reasonable alternative design would be to actually add the engaged PTO which Aiken states would create state of the art safety, but which Cattron removed from the unit sold to Alcan." (Pls.' Resp. [DN 62] 32.) The Court agrees. Plaintiffs have sufficiently set forth evidence of a feasible alternative design: namely, a radio remote control device with both an engaged PTO bar switch and lever bar guard. Cattron suggests that this is not evidence of a feasible alternative design since it cannot be liable under McCabe for the absence of an activated PTO bar switch. However, as discussed above, the Court finds that there is a genuine issue of material fact which precludes summary judgment under McCabe. Plaintiffs have thus met their burden. They were not required to adduce evidence of a feasible alternative design with respect to a device with no activated PTO bar switch.

But even if the Plaintiffs were required to adduce such evidence, the Court finds they have done so through the expert testimony of Kenneth Blundell and Frank Burg.[2] As the Plaintiffs note in their response, this is because "Dr. Blundell stated the opinion that a shielding device would have prevented this accident," (Kenneth Blundell Dep. [DN 64-1] 80-83), and Mr. Burg "favored a guard that flipped over all the controls and is locked where the controls can't possibly be inadvertently contacted." (Frank Burg Dep. [DN 64-2] 98.) Cattron argues that these experts are not qualified to opine that a feasible alternative design existed. The Court disagrees.

Dr. Blundell is a mechanical engineer who works as a consultant in product design and development. (See Blundell Report [DN 64-5].) During his deposition, Dr. Blundell opined that a five-sided lever bar guard may offer an alternative design to the guard on Cattron's radio remote

---

[2] The Court notes that the Plaintiffs make no argument regarding their third expert, Lewis Barbe. This is presumably because Mr. Barbe has admitted that he has not researched the availability of an alternative design that would be safer in this case. (See Lewis Barbe Dep. [DN 54-11] 81, 97.)

control device. Dr. Blundell theorized that with respect to lever bar guards, a five-sided guard might be "the very best you can do . . . ." (Id. at 81.)

Mr. Burg, by contrast, is a certified safety professional and registered professional engineer. (See Frank Burg Report [DN 64-6].) In his deposition, Mr. Burg stated that he does not like the design of the lever bar guard because it leaves too much possibility for inadvertent activation of the controls. (See Burg Dep. [DN 54-5] 98.) He "imagine[s] a guard that flips over all the controls and is locked where the controls can't possibly be inadvertently contacted." (Id.)

According to Cattron, these opinions do not show that a feasible alternative design exists because neither Dr. Blundell nor Mr. Burg have established that their theories would result in a lever bar guard that is safer or more practicable for the radio remote control device's intended use. Cattron notes that Dr. Blundell unequivocally stated in his deposition that he has never designed overhead cranes or radio remote control devices. (See Blundell Dep. [DN 54-6] 34.) Cattron also notes that Dr. Blundell stated that he has not made an actual drawing for his design proposal of a five-sided guard. (Id. at 81.) Likewise, Cattron highlights Mr. Burg's admission that he has never designed a radio remote control device for an overhead crane. (Burg Dep. [DN 54-5] 16, 37.) Cattron relies on Hopkins v. Ford Motor Co., 2011 WL 5525454 (W.D. Ky. Nov. 14, 2011), to support its position. In that case, the Court held that a plaintiff failed to offer proof of a feasible alternative design when his expert had "not designed or built any of these systems," had a "lack of automotive design experience," and lacked "the knowledge and expertise to opine that it could actually be incorporated into a production vehicle." Id. at *4.

The Court finds that this case is distinguishable from Hopkins. While neither Mr. Burg nor Dr. Blundell have designed overhead cranes or radio remote control devices, their experience as engineers renders them competent to express opinions on the lever bar guard's design. After

all, Cattron has not challenged these experts under <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993). Also, unlike the experts in <u>Hopkins</u> who likely lacked knowledge and expertise due to the complex automobile systems which were at issue, the experts here do not lack the knowledge or expertise to offer opinions on creating a guard that more fully covers the motion levers. While Mr. Blundell did not make an actual drawing for his proposal because it "would be potentially a piece of demonstrative evidence," (Blundell Dep. [DN 54-6] 81), he did go into detail as to what such a design would look like. (<u>See</u> <u>id.</u> at 82-102.) The Court finds that this is sufficient. The Plaintiffs have offered evidence of a feasible alternative design.

In sum, the Court finds Cattron's summary judgment motion must be **DENIED** in part as to the Plaintiffs' strict liability and negligence claims. Cattron's summary judgment motion must be **GRANTED** in part as to the Plaintiffs' failure-to-warn claim.

### B. COUNTS IV, V, AND VI: WARRANTIES, GROSS NEGLIGENCE, AND LOSS OF CONSORTIUM

**Warranties.** In Count IV of their Complaint, the Plaintiffs allege that Cattron breached the warranties of merchantability and fitness by providing a product that unreasonably created a risk of injury. (Compl. [DN 1-2] ¶¶ 22-28.) In its summary judgment motion, Cattron notes that there is no contention that its radio remote control device malfunctioned; thus, warranty issues are not viable. (Mem. in Supp. [DN 53-1] 19.) Cattron relies on <u>McCabe</u> for support. There, the Kentucky Supreme Court disposed of the plaintiff's warranty claim after noting that there was no evidence that the aerial boom failed to operate in the intended manner. 594 S.W.2d at 593.

In their response, the Plaintiffs do not argue that the warranty issues are somehow viable. Further, there has been no contention that the radio remote control device failed to operate in the intended manner. (<u>See</u> Aiken Dep. [DN 54-4] 108; Deal Dep. [DN 54-8] 99-101.) Therefore, the

Court finds that Cattron's summary judgment motion is **GRANTED** in part as to the Plaintiffs' warranty claims in Count IV.

**Gross Negligence.** In Count V of their Complaint, Plaintiffs allege that Cattron's conduct "was grossly negligent, reckless, willful, wanton and undertaken in an intentional manner and/or with reckless disregard for the safety and interests of Mr. Gerhardt and others." (Compl. [DN 1-2] ¶ 30.) Although Cattron seeks dismissal of the Plaintiffs' complaint in its entirety, it has not presented arguments for dismissing the gross negligence claim. Nevertheless, the Court has independently reviewed the claim, and the evidence of record bearing thereon, and finds that the Plaintiffs have presented sufficient evidence demonstrating that material issues of fact exist.

Under Kentucky law, gross negligence is a "wanton or reckless disregard for the safety of other persons." <u>Gersh v. Bowman</u>, 239 S.W.3d 567, 572 (Ky. App. 2007). The Court finds that under this standard, a reasonable jury could hold Cattron liable. As noted above, the Plaintiffs have presented sufficient evidence that Cattron was negligent in designing and manufacturing its product without an engaged PTO bar switch. The Court now finds that there is a genuine issue of material fact regarding whether Cattron was grossly negligent in such design and manufacture.

Plaintiffs have presented evidence that Cattron designed the product without an engaged PTO bar switch despite knowledge that doing so would expose Alcan's crane operators to a risk of serious injury or death. On the other hand, Cattron has presented contradictory evidence that it was a greater hazard to leave the PTO bar switches engaged. The Court, therefore, finds that there is a genuine issue of material fact rendering summary judgment inappropriate. Cattron's summary judgment motion is **DENIED** in part with respect to Count V.

**Loss of Consortium.** In Count VI of their Complaint, the Plaintiffs seek damages for Debra Gerhardt's loss of consortium. (Compl. [DN 1-2] ¶¶ 32-33.) In its summary judgment

motion, Cattron argues that since Mr. Gerhardt's claim must be dismissed, the loss of consortium claim must also be dismissed. (See Mem. in Supp. [DN 53-1] 28.) Kentucky law provides that a wife's claim for loss of consortium is derivative since it "derives" from her husband's injury. Daley v. Reed, 87 S.W.3d 247, 250 (Ky. 2002). However, because some of Mr. Gerhardt's claims are still viable, Mrs. Gerhardt's loss of consortium claim is viable. Cattron's summary judgment motion is **DENIED** in part with respect to Count VI.

## IV. ALCAN'S MOTION FOR SUMMARY JUDGMENT [DN 55]

In its summary judgment motion, Alcan argues that Cattron's third-party complaint must be dismissed because: (1) the protections afforded by Kentucky workers' compensation statutes preclude Cattron from seeking indemnification; and (2) Cattron is not entitled to contractual indemnification. (See Mem. of Law [DN 55-1] 8-9.) In response, Cattron accedes that it is "not entitled to indemnification from Alcan for any fault that may be apportioned against Cattron." (Resp. to Mot. to Dismiss Intervening Compl. [DN 60] 2.) Thus, Cattron does not oppose the Court's entry of judgment against it denying indemnification. (Id.) However, Cattron opposes the dismissal of the third-party complaint since it is "concerned that [such] dismissal . . . could jeopardize its entitlement to an apportionment of fault instruction against Alcan." (Id.)

Alcan has conceded that "Cattron is entitled to an apportionment instruction." (Reply to Resp. to Mot. to Dismiss [DN 68] 2-3.) The question is whether Alcan should remain in this case as a third-party defendant. Alcan suggests that this Court "recently provided conflicting opinions on whether an employer should remain in a claim as a third-party defendant in situations like this one . . . ." (Id. at 2.) Nevertheless, it maintains that it "need not remain a third-party defendant for the apportionment instruction to be allowed." According to Alcan, "since the indemnity claim is futile, [it] should be dismissed." (Id. at 2-3.) This Court has provided three opinions on the issue.

First, in <u>Faulkner v. ABB, Inc.</u>, the Court found that while ABB, Inc. was entitled to an apportionment of fault instruction, "Arkema need not be a party to the action in order for fault to be apportioned . . . ." 2009 WL 3462505, at *2 (W.D. Ky. Oct. 22, 2009). In dismissing Arkema from the action, the Court noted that the indemnity claim was futile because "it is limited by Kentucky statute to the amount of workers' compensation benefits which have already been paid by Arkema." <u>Id.</u> at *3. In other words, the Court found that Arkema's dismissal was appropriate because ABB, Inc. could "have no successful claim against [it]." <u>Id.</u>

Second, in <u>Smith v. Parker-Hannafin Corp.</u>, the Court similarly found that while Parker-Hannafin Corp. was entitled to an apportionment of fault, PSC "need not be a party to this action in order for fault to be apportioned . . . ." 2013 WL 1337378, at *2 (W.D. Ky. Mar. 29, 2013). In dismissing PSC from the action, the Court again noted that the indemnity claim was futile. <u>Id.</u> at *3. It then found that PSC's dismissal was appropriate because Parker-Hannafin Corp. "cannot maintain a successful indemnification claim against [it]." <u>Id.</u>

Third, in <u>Lindsey v. Cargotec USA, Inc.</u>, the Court reached a different result, refusing to dismiss Purdue Farms and Shultz from the action. No. 4:09-CV-00071-JHM, at *6 (W.D. Ky. Mar. 8, 2013). In so doing, the Court held that while Kentucky workers' compensation statutes limit an employer's liability to the amount of workers' compensation benefits that have already been paid by the employer, "this limitation alone does not mandate dismissal of the indemnity claim." No. 4:09-CV-00071-JHM, at *6 (W.D. Ky. Mar. 8, 2013). The Court relied on <u>Franke v. Ford Motor Co.</u>, 398 F. Supp. 2d 833, 840 (W.D. Ky. 2005), for the position that the indemnity claim was "not legally futile." <u>Id.</u> The Court went on to distinguish itself from <u>Franke</u>, noting:

> While the district court in <u>Franke v. Ford Motor Company</u> recognized that a product manufacturer's indemnity claim against an employer is not legally futile, the district court, after reviewing the facts of the case, held that there was no reasonable basis for an indemnity claim under the facts of the case. . . .

. . . The parties have not addressed whether the facts of this case provide a reasonable basis for an indemnity claim. Accordingly, the Court expresses no opinion on the issue.

Id. at *7. In other words, the Court refused to dismiss Purdue Farms and Shultz since the parties had not addressed whether the facts provided any other reasonable basis for an indemnity claim.

In this case, the Court finds that Alcan's dismissal is warranted. Unlike the parties in the Lindsey case, the parties here have fully addressed whether the facts provide a basis for a valid indemnity claim—and they agree that they do not. Therefore, the Court finds that there is no reasonable basis for an indemnity claim. Cattron's claims against Alcan can be dismissed. Alcan's summary judgment motion is **GRANTED**. This does not alter the fact that there shall be an apportionment of fault instruction pursuant to Ky. Rev. Stat. § 411.182.

## V. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Cattron's Motion for Summary Judgment [DN 53] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to the Plaintiffs' failure-to-warn claim and warranty claims. It is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Alcan's Motion for Summary Judgment [DN 55] is **GRANTED**.

cc: counsel of record